**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

## THIS IS A CAPITAL CASE

MARCEL WAYNE WILLIAMS                                                                PETITIONER

v.                                            No. 5:02CV00450 JLH

LARRY NORRIS, Director,
Arkansas Department of Correction                                                RESPONDENT

### OPINION

Marcel Wayne Williams was convicted of capital murder, kidnapping, rape, and aggravated robbery. He was sentenced to death by lethal injection. He has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. This Court previously entered an Opinion and Order dismissing many of his claims, reserving some of his claims for further argument, and granting an evidentiary hearing on one of the claims. In that previous Opinion and Order, this Court found by clear and convincing evidence that the Supreme Court of Arkansas erred in holding that the decision of Williams's lawyers not to introduce mitigation evidence at the penalty phase was a reasonable trial strategy. This Court concluded that that holding was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. Pursuant to Rule 8(a) of the Rules Governing Section 2254 Cases, this Court concluded that an evidentiary hearing was needed on the issue of whether the errors of Williams's trial lawyers at the penalty phase rendered the result at the penalty phase unreliable. The Court reserved for further argument other claims asserted by Williams in his petition.

The evidentiary hearing has been conducted, and the parties have submitted their additional arguments on the remaining issues. For the reasons that will be explained hereinafter, the Court

finds, by clear and convincing evidence, that the ineffectiveness of Williams's trial lawyers in failing to present mitigation evidence at the penalty phase was prejudicial and therefore orders that the State conduct a new trial at the penalty phase or reduce Williams's sentence to life without parole.  The Court denies Williams's petition as to all other claims.

## I.        CLAIM NO. 2.  ERRORS AND OMISSIONS BY TRIAL COUNSEL DURING THE PENALTY PHASE OF THE TRIAL DEPRIVED MR. WILLIAMS OF HIS CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL AND TO A FAIR TRIAL.

As noted in the Court's previous Opinion and Order, Williams's lawyers decided not to contest his guilt and in fact, with his permission, conceded his guilt in opening statement with a view toward obtaining a sentence of life without parole at the penalty phase of the trial.  In view of the overwhelming evidence of Williams's guilt, that decision was a reasonable trial strategy.  However, at the penalty phase, Williams's lawyers in effect presented no evidence.  Their only witness was an inmate who had once been on death row but whose sentence had been reduced to life.  He testified that his living conditions were more pleasant on death row than in the general population of the prison.  Williams's lawyers were aware that the conditions in which Williams had been raised, if presented to a jury, could be grounds for mitigation at the penalty phase of a capital case.  At the Rule 37 hearing in state court, one of Williams's lawyers testified that Williams had a "pretty troubled past" and stated:

> According to . . . my interviews with him, he had been in training school early, you know, eleven, twelve, thirteen years old.  Spent time there, got out.  Committed another offense that ended up getting him in the Department of Corrections.  From talking with him, his mother didn't provide very much of a home life for him.  I believe he had a step-father or another man living in the house who he had confrontations with.  I don't believe that there was a lot of food or, well, I think they had bare necessities, but I think there were times where they didn't have what they needed.  I believe there was some discussions of his mother having – I don't want to

offend Mr. Williams – but a revolving door. I believe there were a lot of men in and out of the house, which caused a problem for a young man seeing that. And that she possibly used drugs and used drugs in his presence and he used drugs with her. So those are things . . . that obviously show he had a troubled background.

(Rule 37 Hr'g R. at 53-54, Feb. 18, 2000.) The same lawyer reviewed Williams's psychiatric records showing that Williams had sought and received psychiatric treatment while incarcerated. *Id*. at 57. He also knew that Williams had been raped while he was in prison during his first incarceration. *Id*. at 57-59.

Another of Williams's lawyers testified at the Rule 37 hearing:

I think there was a huge amount of mitigation that could have been brought forward. I believe that this man's life from the time . . . he went to prison when he was fourteen or fifteen. He . . . went to training school. He got out and robbed some place with a broken shotgun because he thought he could go back to training school, was charged as an adult and went to prison and then got out seven months before this happened, I believe. And . . . the evidence would have showed that his family life was pretty messed up, that he didn't have a lot of guidance. As I recall, maybe his father wasn't around.

\* \* \*

As I recall and I don't remember all the facts, but I do remember . . . the biggest thing to me was, I mean, Marcel went to training school, as I recall, about thirteen, was there for a while, got out. It was the only structure he'd ever had. And then went on to commit this crime. It was his testimony that he did specifically to get back to the training school. I mean, he grew up in prison. . . . [W]ithout being specific I think he learned about love, he learned about life in prison. He never really knew anything outside in his formative years.

*Id*. at 83-84. This lawyer testified that he believed "without question" that the story of Williams's life should have been told to the jury. *Id*. at 84.

The testimony introduced by Williams at the evidentiary hearing conducted by this Court confirms and develops in greater detail the description of his youth and adolescence offered by his

lawyers at the Rule 37 proceeding in state court.[1]  The Court has prepared an abstract of the testimony offered at the evidentiary hearing in this proceeding.  That abstract is attached to this Opinion as Appendix I.  The upshot, as stated by Dr. David Lisak in his testimony, is that Marcel Wayne Williams was subject to every category of traumatic experience that is generally used to describe childhood trauma.  He was sexually abused by multiple perpetrators.  He was physically abused by his mother and stepfather, who were his primary caretakers.  He was psychologically abused by both of his primary caretakers.  He was subjected to gross neglect in all categories of neglect: medical, nutritional, educational.  He was a witness to violence in the home and in his neighborhood throughout his childhood.  As an adolescent, he was violently gang-raped in prison.

In *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003), the Supreme Court stated:

> The mitigating evidence counsel failed to discover and present in this case is powerful. . . .  Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother.  He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care.  The time Wiggins spent homeless, along with his diminished mental capacities, further augment his mitigation case.  Petitioner thus has the kind of troubled history we have declared relevant to assessing a defendant's moral culpability.
>
> * * *
>
> Given both the nature and the extent of the abuse petitioner suffered, we find there to be a reasonable probability that a competent attorney, aware of this history, would have introduced it at sentencing in an admissible form.
>
> * * *
>
> We further find that had the jury been confronted with this considerable mitigating evidence, there is a reasonable probability that it would have returned with a different sentence.

---

[1] The State did not object to the decision of this Court to conduct an evidentiary hearing on that issue, nor has the State argued that the Court should not consider that evidence in ruling on Williams's Rule 37 petition.

*Id*. at 534-36, 123 S. Ct. at 2542-43. The evidence here is as compelling as the evidence in *Wiggins*, where the Supreme Court granted a petition for writ of habeas corpus pursuant to the standards of the amendments to 28 U.S.C. § 2254 that were enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *See* 28 U.S.C.A. § 2254(d) (West Supp. 2006). Likewise, the evidence here is as compelling as the evidence in *Simmons v. Luebbers*, 299 F.3d 929 (8th Cir. 2002), where the court also granted a petition for writ of habeas corpus, finding that the lawyers who represented a defendant in a capital case were ineffective for failing to present at the penalty phase evidence that the defendant had been abused and neglected during his childhood.

On the merits, there is no meaningful difference between this case and *Wiggins* and *Simmons*. Here, the record has been more fully developed in an evidentiary hearing conducted pursuant to Rule 8(a) of the Rules Governing Section 2254, whereas in *Wiggins* and *Simmons* the mitigation evidence was fully developed in state court. However, as noted above, the State did not object to the Rule 8(a) evidentiary hearing conducted in this proceeding, nor has the State argued that the Court should not consider the evidence introduced at that hearing.

The lawyers who defended Marcel Wayne Williams were ineffective in failing to present mitigation evidence at the penalty phase of his capital trial, and it is reasonably likely that, had that evidence been presented, the jury would have returned a verdict of life without parole rather than death. Williams's death sentence was imposed in violation of his right to counsel as clearly established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The decision of the Arkansas courts to the contrary is an unreasonable application of the holding of *Strickland* to the facts of this case. Therefore, Williams's death sentence must be set aside. The State must try the penalty phase of Williams's trial again

within 120 days of entry of the Judgment and Decree entered pursuant to this Opinion or change his sentence to life without parole.

II.     **CLAIM NO. 1.   THE PROSECUTING ATTORNEYS' INTENTIONAL USE OF PEREMPTORY STRIKES IN A RACIALLY DISCRIMINATORY MANNER DENIED MR. WILLIAMS A FAIR TRIAL.**

Williams argues that the prosecuting attorneys intentionally used their peremptory strikes in a racially discriminatory manner.  Williams argues that the prosecutor struck prospective jurors Shirley Artis, Columbus Strain, and Lou Chandler because they were black.

In *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), the Supreme Court held, "Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." *Id*. at 86, 106 S. Ct. at 1717.  The burden is on the defendant to prove the existence of purposeful discrimination.  *Id*. at 93, 106 S. Ct. at 1721.  A defendant may establish a prima facie case of purposeful discrimination in selection of the jury based on the prosecutor's exercise of peremptory strikes if the defendant first shows that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the panel members of the defendant's race.  *Id*. at 96, 106 S. Ct. at 1723.

> In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances.  For example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination.  Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose.  These examples are merely illustrative.  We have confidence that trial judges, experienced in supervising *voir dire*, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.

*Id*. at 96-97, 106 S. Ct. at 1723. "Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." *Id*. at 97, 106 S. Ct. at 1723. The trial court then must determine if the defendant has established purposeful discrimination. *Id*. at 98, 106 S. Ct. at 1724; *see also Johnson v. California*, 545 U.S. 162, 168, 125 S. Ct. 2410, 2416, 162 L. Ed. 2d 129 (2005). "Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Batson*, 476 U.S. at 98 n.21, 106 S. Ct. at 1724.

The record shows that forty-nine members of the venire panel were questioned during voir dire. The panel members were questioned in groups of three. Of those forty-nine, sixteen were excused by the court, leaving thirty-three available to be seated. Of those thirty-three persons, twenty-five were white, and eight were black. By statute, the State was permitted ten peremptory challenges, and the defense was permitted twelve. *See* ARK. CODE ANN. § 16-33-305. Each side was allowed one additional strike in selection of alternates. *See* ARK. CODE ANN. § 16-30-102. Thus, the State could have used a total of eleven strikes, while the defense had a total of thirteen. The State used seven peremptory challenges. Four of the State's peremptory strikes were exercised on black panel members, three on white panel members. One of the black members struck by the State was seated on a *Batson* challenge. The defendant used twelve strikes during selection of the jury and one during selection of alternates for a total of thirteen strikes. Of those thirteen, twelve were used to strike white panel members and one was used to strike a black panel member. Twelve jurors and two alternates were seated. Of the twelve jurors, three were black, and nine were white. One of the alternates was black, and one was white. At the beginning of the trial, juror No. 12

reported by telephone that he was ill. He was replaced by alternate No. 1, who was black. Thus, four of the twelve jurors who decided Williams's case were black.

The Court has prepared a chart identifying by name, race, and sex each person who was called for questioning in each group during the voir dire process. The chart states the educational level of each prospective juror who was not struck for cause. The chart is attached to this Opinion as Appendix II.[2]

At trial, Williams made a *Batson* challenge with respect to each black panel member who was peremptorily struck by the State. As noted, eight black panel members were available to be seated. The first, Bobby Pollins, was seated. The second, Shirley Artis, was peremptorily struck by the State; the trial judge reserved ruling on the *Batson* challenge until it came time to seat juror No. 12, and then the trial judge overruled that *Batson* challenge. The third black panel member, Harold Eason, was seated. The fourth, Columbus Strain, was peremptorily struck by the State, and the *Batson* challenge was overruled. The fifth, Lou Chandler, was peremptorily struck by the State, and the *Batson* challenge was overruled. The sixth, Cynthia Collins, was peremptorily struck by the State but then seated when the trial judge upheld the *Batson* challenge. The seventh, Mr. Reed,[3] was approved by the State but struck by the defendant. The eighth, Sandra Woods, was seated as alternate No. 1. Woods replaced juror No. 12, a white male, on the first day of trial.

_____

[2] The chart is based on the transcript and on the juror biographies provided to this Court and filed under seal. The only information taken from the juror biographies are first names that do not appear in the transcript and educational levels that are not mentioned in the transcript.

[3] The record does not show Mr. Reed's first name, nor does his name appear among the juror biographies that have been provided to the Court and placed in the record under seal.

On direct appeal, Williams raised the *Batson* challenge as to Artis, but he did not argue his claims that Chandler and Strain were struck for racially discriminatory reasons, so those claims are procedurally defaulted. Williams argues that the Court can consider the actions of the prosecutor vis-a-vis Chandler and Strain as evidence of discriminatory intent with respect to Artis, so the Court will address the issue of whether the strikes against Chandler and Strain manifest discriminatory intent.

The Supreme Court of Arkansas addressed Williams's *Batson* challenge at length. *See Williams v. State*, 338 Ark. 97, 109-12, 991 S.W.2d 565, 571-73 (1999) ("*Williams I*"). The court restated the holding in *Batson* and then proceeded to apply that holding to the facts of this case. The court concluded:

> Consistent with our holdings, the record reflects the [trial] court struggled over this issue, weighing and assessing the facts and arguments presented, to decide whether the State's explanation was merely pretextual. Upon review, we cannot say that the trial court's rulings were clearly against the preponderance of the evidence.

*Id*. at 112, 991 S.W.2d at 572 (citation omitted). Williams argues that this statement by the Supreme Court of Arkansas was an unreasonable determination of the facts in light of the evidence in the record.

Part of Williams's argument is based on the assertion, "the trial court was resistant to the requirements of *Batson* from the start." That assertion is made in light of comments made by the trial judge in the course of granting the *Batson* challenge with respect to Cynthia Collins. The record contains the following colloquy:

> **THE COURT:**  As to Ms. Collins?
>
> **MS. BALL:**  Strike.

**MR. WRIGHT:**   Your Honor, I make my <u>Batson</u> objection.  Ms. Collins is an African American lady.  She's got a BA Degree.  She appears to be educated enough to understand the DNA evidence.  I didn't hear her answers to any of the questions that she equivocated that she would have any trouble with the death penalty at all.  My client's also an African American.

**THE COURT:**   Well, let me also say for the record, if she's struck that'll be the State used 66% of it's strike to reduce the population of the jury – blacks on the jury by 66%.  So what is your racial initial –

**MS. BALL:**   I'll be happy to tell you.  Judge, she talked about she'd been on the fence, that she'd argued for and against the death penalty.  She'd gone back and forth on whether or not the death penalty was appropriate.  She does not rise to the level of cause.  I agree with that.  I said, "Can you sign the death verdict form for death penalty?"  She said, "Yes, if I think it's the right thing to do."  If I'm going to – whatever she said.  She said, "Yes."  She said, "I wouldn't like it, but I'd do it."

My main concern with her is that she talked about going back and forth and back and forth on whether or not that she approved of the death penalty.  And that they had had discussions about it at school and that she has been on the fence and I think she said she was on the fence.  But regardless, in recent history she was on the fence and I just don't think that that is the type of juror that the State wants to put on the jury panel and ask them for the death penalty.  I would rather put someone who is stronger than that on the death penalty and those are my reasons.

**THE COURT:**   Well, there are several factors the Supreme Court said you look towards.  One is numerical, you know, and I don't necessarily agree with numerical, but in this instance that 66% to reduce it by 66%, that is an enormous disparity.

The other thing that the Court looks at is whether the inquiry into the potential juror is more rigorous in a particular aspect than it is for the other on the narrow.  In this particular case, she was asked about her history, how solid she was, how she formed those opinions.  She was the only person that I can remember in the two days that has been inquired of at that level.  I'm going to grant the motion and seat her.

**MS. BALL:**   Your Honor, may I just ask one question?

**THE COURT:**   Sure.

**MS. BALL:**   Okay.  I had thought those were follow-up questions to what she said.  I am not striking her because she's black.  That is not why I'm striking her.

**THE COURT**: Well, I understand that. I don't believe you are. But I think the appearance of it is, and I think <u>Batson</u> is the most ridiculous concept that a Judge has ever had to work with. We read these cases and they don't give you any guidelines. They don't give you any indication of how you're suppose to do this.

The United States Supreme Court made a terrible mistake. They should have outlawed peremptory challenges, because this puts a burden on the judiciary that is untenable. But given the [parameters] that they've given us, given the fact that the Defendant is black and the victim is white, given the disparity in the number of challenges exercised on blacks, which is 66% if this would stand, and given the reduction of the panel by 66%, given the inquiry –

**MS. BALL**: Even though they were follow-up questions?

**THE COURT**: Well, let me – it's my turn.

**MS. BALL**: I'm sorry. I'm sorry.

**THE COURT**: There was follow-up questions, but given the level of inquiry I agree with Defense on this particular. I think that I'm going to seat her as juror number nine.

**MS. BALL**: I will not say another word if you tell me not to.

**THE COURT**: No, you go ahead. I just wanted to finish because I've got a short train of thought.

**MS. BALL**: I apologize for interrupting you. I'll just say frankly to the Court and to the Defense, I am real concerned that she won't be able to give him the death penalty and I think he deserves it. That's why I wanted her off. That's the bottom line.

**THE COURT**: Well, I'm going to give you the bottom line. The bottom line is the Defendant in this Court has a right to a fair trial. If the State uses even the appearance of it's challenges to strike blacks from the jury, I'm not going to condone it. That's my job. I've been told by the United States Supreme Court. So, we can make statements and if we're going to make statement's, we'll both talk. Now, I've made my ruling.

(Trial Tr. 462-66.)  Later, the trial judge stated, "I'm going to follow the law as I see it and I wish the United States Supreme Court would revisit this issue and do away with peremptories.  I think that we'd all be better off if we excused for cause and put twelve in the box."  *Id*. at 469.

As these portions of the transcript show, the trial judge expressed some frustration with the lack of guidance from the Supreme Court as to how to implement *Batson*.  However, he did not disagree with the central holding of *Batson* that purposeful racial discrimination in selection of a jury violates a defendant's right to equal protection.  He agreed with that central holding of *Batson* but stated that the Supreme Court had failed to impose the remedy necessary to accomplish *Batson*'s goals.  In the trial judge's view, the best way to achieve *Batson*'s goals would be to require the elimination of peremptory challenges.  The view stated by the trial judge on the record in this case is the view stated by Justice Thurgood Marshall in his concurring opinion in *Batson*.  476 U.S. at 102-08, 106 S. Ct. at 1726-29.  Justice Marshall wrote:

> The decision today will not end the racial discrimination that peremptories inject into the jury-selection process.  That goal can be accomplished only by eliminating peremptory challenges entirely.

*Id*. at 102-03, 106 S. Ct. at 1726.  Likewise, in *Miller-El v. Dretke*, 545 U.S. 231, 266-73, 125 S. Ct. 2317, 2340-44, 162 L. Ed. 2d 196 (2005), Justice Stephen Breyer wrote a concurring opinion in which he reiterated and further developed Justice Marshall's argument that the only effective way to eliminate racial discrimination in the jury selection process would be to eliminate peremptory challenges.  Both Justice Marshall and Justice Breyer would have agreed with the trial judge in this case that the Supreme Court in *Batson* "made a terrible mistake.  They should have outlawed peremptory challenges, because this puts a burden on the judiciary that is untenable."  That the trial

judge in this case agreed with the concurring opinions of Justices Marshall and Breyer hardly shows that he "was resistant to the requirements of *Batson* from the start."

The comments to which Williams takes exception were made as a part of the explanation for upholding the *Batson* challenge with respect to Cynthia Collins. During the course of that explanation, the trial judge explained that, while he disagreed with the majority decision in *Batson* not to eliminate peremptory challenges altogether, and while he was frustrated with the difficulty in applying *Batson* and the lack of guidance from the Supreme Court, he fully intended to follow and to implement that decision. His comment was, "The bottom line is the Defendant in this Court has a right to a fair trial. If the State uses even the appearance of it's challenges to strike blacks from the jury, I'm not going to condone it. That's my job. I've been told by the United States Supreme Court." These are not the remarks of a judge who "was resistant to the requirements of *Batson* from the start" as Williams contends. Indeed, the trial judge imposed a standard more stringent than the one imposed by *Batson*. *Batson* does not require a trial judge to uphold a peremptory challenge based on the appearance that the opposing party is using its challenge in a racially discriminatory manner; yet, that was the standard imposed by the trial judge in this case.

Part of Williams's argument is that the trial judge erroneously ruled as to Shirley Artis that Williams had not established a prima facie case of discrimination and never ruled on whether the prosecution's race-neutral justification for striking Artis was pretextual. A total of six persons were called for questioning as a part of Group 1.[4] Four of the six were struck for cause. Bobby Pollins, a black male, was seated as juror No. 1. Shirley Artis was struck by the State after Pollins had been

---

[4] Only three were questioned at one time, but when a prospective juror was excused another was called to take his place.

seated.  The trial judge asked the prosecutor to state the racially neutral reason for the use of the peremptory strike, and the prosecutor replied, "One of our profiles for the jurors is that we want the best educated jurors that we can because of the DNA evidence and that's my reason."  After those prospective jurors left, the prosecutor referred to the juror biographical information provided by the court, noting that Artis had a high school education and was a shipping clerk for Maybelline.  Later, after the State accepted Brenda Sherrill, a white female with a high school education, the trial judge sua sponte stated, "I also want to show that Ms. Sherrill has a high school education and was accepted by the State.  I think that ought to be part of the record."  (Trial Tr. 201.)  That the trial judge was careful to make a record on this point belies, again, the argument that he was resistant to the requirements of *Batson*.  In response, the prosecutor stated:

> [Ms. Artis] did not appear to me to be bright when I was talking to her.  She also was a shipping clerk for Maybelline.  All of these things worried me in conjunction with DNA.  Ms. Sherrill appeared to be articulate.  She's also a manager of a store.  I felt like that that boded well for . . . understanding the DNA evidence.

*Id*.  During this time, the trial judge had not excused Artis because he wanted to see whether a pattern developed of using peremptory strikes to exclude blacks.  When it came time to seat juror No. 12, defense counsel requested a ruling on whether Artis would be seated, and the trial judge made the following comments:

> Well, I just, you know, I think the Prosecutor – I think the high school was probably inappropriate way to say it, but I think they felt that from her responses and her background that perhaps she wasn't the person they wanted because of her ability to understand the evidence in this case.
>
> But anyway, I don't think they even have to get to that point.  I don't think at the time that they exercised that peremptory that there had been . . . prima [facie] showing that there was discriminatory basis for that strike.

*Id*. at 496-97. After further colloquy, the trial court stated, "let me say that I don't think that at the time the objection was made to Ms. Artis that there had been a prima [facie] case showing a discrimination and I don't know – but anyway, I don't think the State had to justify it, but they did . . . ." *Id*. at 498.

Williams correctly argues that the trial judge erred when he judged whether there had been a prima facie showing of purposeful racial discrimination based on the state of the evidence at the time that Artis was struck. A defendant can establish a prima facie case of discriminatory jury selection by "the totality of the relevant facts" about a prosecutor's conduct during the defendant's trial. *Batson*, 476 U.S. at 93-94, 96, 106 S. Ct. at 1721, 1723; *Miller-El*, 545 U.S. at 249, 125 S. Ct. at 2324. A pattern of strikes against black jurors can give rise to an inference of discrimination. *Batson*, 476 U.S. at 97, 106 S. Ct. at 1723. Although the trial judge referred in his remarks to the state of the record at the time the challenge to Artis was made, in fact he decided not to excuse her until the twelfth juror was seated so that he could review all of the evidence and determine whether the prosecutor's use of a peremptory strike to remove her from the jury was purposeful racial discrimination. In part of his remarks explaining his reason for overruling the *Batson* challenge as to Artis, he referred to the fact that the statistical relationship between blacks and whites, as voir dire neared its conclusion, had led him to the conclusion that there was not a prima facie case that the State intentionally excused Artis for racial reasons. In other words, despite his comments regarding the state of the evidence at the time Artis was struck, the trial judge did take into account subsequent developments. He also ruled that, even if a prima facie case had been made, the race-neutral reason offered by the prosecutor was credible. He stated, "I think the high school was probably inappropriate way to say it, but I think they felt that from her responses and her background that

perhaps she wasn't the person they wanted because of her ability to understand the evidence in this case." He also commented, "I don't think the State had to justify it, but they did." Thus, as to Artis, despite his own remarks, the trial judge considered the entire voir dire process in ruling that there had not been a prima facie showing of racial discrimination in the use of a peremptory strike with respect to Artis; and he ruled that the State had offered a race-neutral reason inasmuch as the prosecutor did not believe "from her responses and her background" that she was a juror the prosecution wanted "because of her ability to understand the evidence in this case."

The Supreme Court of Arkansas held that those findings were not clearly against the preponderance of the evidence. *Williams I*, 338 Ark. at 112, 991 S.W.2d at 572. This Court cannot, from a review of the transcript, conclude that the holding of the Supreme Court of Arkansas is an unreasonable determination of the facts or an unreasonable application of clearly established federal law. A reviewing court may be able to determine from the transcript the race of the persons that the prosecutor peremptorily struck, the race of those persons that the prosecutor did not peremptorily strike, the education levels of the prospective jurors, other such biographical data, whether the prosecutor asked more or different questions of persons of one race than of persons of another race, and other such objective information. However, the ultimate issue is whether the prosecutor engaged in purposeful racial discrimination, which is to say, the ultimate issue relates to the prosecutor's mental state. The prosecutor's state of mind, apart from explicit comments by the prosecutor, is difficult for a court to determine, especially from a mere review of the transcript. Furthermore, with respect to Artis, the question in part is whether it was reasonable to think that Artis, indeed, had less ability to understand DNA evidence than other jurors who were seated, including jurors with comparable levels of education. The transcript shows that other jurors with no more education than

Artis were seated, but the extent of Artis's ability compared to other jurors cannot be ascertained from the transcript. It is precisely because of such difficulties that the Supreme Court in *Batson* held that a reviewing court ordinarily should give the trial judge's findings "great deference." *Batson*, 476 U.S. at 98 n.21, 106 S. Ct. at 1724.

Here, there is evidence from which the Arkansas courts could reasonably find that the prosecutor did not engage in purposeful racial discrimination in the selection of the jury. As noted above, eight of the prospective jurors were black. The prosecutor exercised, or attempted to exercise, a peremptory strike on four of those persons and approved of four of them, even though she had four peremptory strikes that she never used. This is not the kind of systematic exclusion of black persons from a jury that typically has led reviewing courts to hold that the prosecutor engaged in purposeful racial discrimination. In *Batson*, the prosecutor used his peremptory challenges to strike all four black persons from the panel, and a jury composed only of white persons was selected. *Id*. at 83, 106 S. Ct. at 1715. In *Miller-El*, of twenty black members of the panel, only one served; nine were excused for cause or by agreement; and ten were peremptorily struck by the prosecution. 545 U.S. at 240-41, 125 S. Ct. at 2325. In *Johnson v. California*, the prosecutor struck all three prospective jurors who were black. 545 U.S. at 164, 125 S. Ct. at 2414. In *United States v. Sherrills*, 929 F.2d 393, 394 (8th Cir. 1991), six black persons were included in the panel, one was struck for cause, and the government then attempted to use peremptory strikes to eliminate the other five from the jury. In *Garrett v. Morris*, 815 F.2d 509, 510 (8th Cir. 1987), which Williams says is indistinguishable from this case, the prosecutor struck all three prospective jurors who were black. In *Walton v. Caspari*, 916 F.2d 1352, 1354 (8th Cir. 1990), the prosecutor used all fourteen

peremptory challenges to exclude fourteen of fifteen black persons from the panel of prospective jurors.

Williams correctly points out that the exclusion of even one black person from the jury based on race is a violation of the Constitution, even if other black persons were seated. *See Devose v. Norris*, 53 F.3d 201, 203-05 (8th Cir. 1995); *United States v. Battle*, 836 F.2d 1084, 1085-86 (8th Cir. 1987). Still, the question here is not whether Artis could be excluded from the jury because of her race even though other members of her race were seated; obviously she could not. The question here is whether it was unreasonable for the Arkansas courts to find that Artis was not struck from the jury because of her race in view of the fact that the prosecutor approved of four black persons being seated on the jury. From a review of the transcript, this Court simply cannot say that the finding by the Arkansas courts is an unreasonable one.

Assuming that a prima facie case of racial discrimination had been established, the prosecutor offered a race-neutral reason for using a peremptory strike to exclude Artis, i.e., that she did not appear to have the ability to understand the DNA evidence. As noted above, it is not possible from the transcript to determine whether Artis had such ability, or how her ability compared to that of other jurors. The use of this type of subjective judgment is a cause of concern because such judgments are susceptible to the kind of abuse prohibited by *Batson*. *See United States v. Scott*, 26 F.3d 1458, 1466 (8th Cir. 1994); *Reynolds v. Benefield*, 931 F.2d 506, 513 (8th Cir. 1991). Nevertheless, it appears from a review of the transcript that the trial judge found this explanation to be credible, and the Supreme Court of Arkansas held that the trial judge's finding was not clearly contrary to the preponderance of the evidence. Assuming, again, that a prima facie case had been

established, this Court cannot say that the determination of the Arkansas courts on this issue was unreasonable.

Though Williams's claims regarding Columbus Strain and Lou Chandler are procedurally defaulted, Williams argues that the actions of the prosecutor in striking them can be considered as evidence that the striking of Artis was purposeful racial discrimination. Strain stated during voir dire that he thought that he recognized the defendant and that he might have difficulty putting his name on the death penalty form. Williams points out that Strain stated at times during voir dire that his feeling that he recognized Williams would not impact his decision, and Williams also notes that the prosecutor permitted two white jurors to be seated who expressed reservations about the death penalty. However, the fact is that Strain said, "It looks like I know the guy," and he was the only prospective juror to say something to that effect. After several follow-up questions the prosecutor asked:

> **MS. BALL:** If you feel like you've seen him before and you truly feel that the death penalty is the correct punishment, is that going to impact you on whether or not you can sign the verdict form?
>
> **JUROR STRAIN:** It might. It might. I'm being honest about it.

(Trial Tr. 358.) The prosecutor's use of a peremptory strike to exclude Strain does not show purposeful racial discrimination.

The situation is similar with respect to Lou Chandler. When questioned by defense counsel, Chandler stated, "As far as my religious belief, I don't believe in capital punishment." Even so, she stated that she could consider the death penalty or life without parole if the law authorizes both punishments. She also stated that she had a son who had been convicted on a drug charge. Some of the white jurors who were eventually seated likewise expressed reservations about the death

penalty. One white juror had previously been convicted of driving while intoxicated. Even so, that the prosecutor peremptorily struck Chandler does not show purposeful racial discrimination. Chandler expressed religious convictions in opposition to the death penalty, and she also had a son who had been convicted on a drug charge. No other juror was similar to Chandler in both of those respects.

This is not a de novo review, nor is the issue here whether the transcript definitively excludes the possibility that race was a factor in the prosecutor's use of peremptory strikes. If the law authorized a de novo review, or if the law required that the evidence exclude the possibility that race was a factor in the use of peremptory strikes, the outcome might be different; but the law does not authorize de novo review, nor does the law impose a requirement that the evidence exclude the possibility that race was a factor in the prosecutor's use of peremptory strikes. The issue here is whether the Arkansas courts made an unreasonable determination of the facts or unreasonably applied clearly established federal law. A measure of deference to the state courts is built into that standard. The decision of the Arkansas courts that the State's use of a peremptory strike to remove Shirley Artis was not purposeful racial discrimination is a reasonable decision based on the record, even though the contrary finding also would be reasonable. Therefore, Williams's petition for writ of habeas corpus is denied on this issue.

## III. CLAIM NO. 5. MR. WILLIAMS'S RIGHT TO A FAIR TRIAL WAS VIOLATED BY THE PRESENCE ON HIS JURY OF INDIVIDUALS WHO COULD NOT SIT AS FAIR AND IMPARTIAL JURORS.

Williams argues that jurors Kay Barfield, Carol Benton, and Charles Jamison should have been struck for cause and that the failure of the trial court to grant his motion to strike them for cause renders his conviction and sentence unconstitutional. Williams cites *Morgan v. Illinois*, 504 U.S.

719, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992), and *Wainwright v. Witt*, 469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985). *Morgan* held that a juror who would automatically impose a death sentence upon a conviction of a capital offense may be challenged for cause. In *Wainwright*, the Court held that a juror may be struck for cause if his views prevent or substantially impair the performance of his duties in accordance with the instructions and his oath.

Here, the record shows that Barfield was seated as juror No. 3. Williams used two of his peremptory strikes to exclude Benton and Jamison. He used all of his peremptory strikes before the conclusion of voir dire and wished to but was unable to strike Thurman Fortson, who was seated as juror No. 12. However, Fortson reported that he was ill and could not attend on the day that opening statements were made and the first evidence received, so he was replaced by alternate No. 1, Sandra Woods. Woods was a black female to whom Williams voiced no objection. Consequently, the only juror who participated over objection by Williams was Kay Barfield. Therefore, the only juror about whom Williams can now argue is Barfield. *See Ross v. Oklahoma*, 487 U.S. 81, 85-86, 108 S. Ct. 2273, 2276-77, 101 L. Ed. 2d 80 (1988) (ruling that although the trial court erred in failing to strike a juror for cause, the Constitution is not violated if that juror did not sit, and those who did sit were impartial).

Williams says that Barfield stated that she would refuse to weigh youth as a mitigating factor and that she believed that everyone guilty of a homicide categorically deserves capital punishment. Williams also says that Barfield opined that the criminal justice system was not tough enough on criminals, that criminal defendants should get harsher sentences, and should be refused medical treatment for serious conditions like diabetes. Williams further argues that Barfield should have been excluded because of mental incompetency stemming from a nervous condition and intoxication.

The transcript does not show that Barfield harbored biases or suffered from mental incompetency that rendered her unfit to sit as a juror in this case.  Barfield first responded to a substantive question when the prosecutor turned to her after Cheryl Benton (who was later struck by the State) stated that she would not vote for capital punishment if there was any doubt whatsoever in her mind, even if the judge had said that the standard was proof beyond a reasonable doubt.  After that answer, the prosecutor turned to Barfield, said that Barfield had caught her eye when Benton was speaking, and engaged Barfield in the following colloquy:

> **MS. BALL:**  . . . Were you agreeing with her or is that the way you feel too?
>
> **JUROR BARFIELD:**  I wouldn't want to, you know, give the death penalty, not if I wasn't sure.
>
> **THE COURT:**  I'm sorry, I couldn't hear you.
>
> **JUROR BARFIELD:**  If I wasn't sure, I couldn't go with the death penalty.
>
> **MS. BALL:**  Okay.  So you would hold me to a higher burden of proof than what the judge would instruct you on?
>
> **JUROR BARFIELD:**  I guess so.
>                          * * *
> **MS. BALL:**  So I will have to prove to you the guilt of the Defendant beyond all doubt; is that right?
>
> **JUROR BARFIELD:**  Pretty much, yeah.
>
> **MS. BALL:**  Okay.
>
> **JUROR BARFIELD:**  I'd have to be sure, you know.

(Trial Tr. 209-10.)  Thereafter, Ball explained the phases of a capital trial and the fact that mitigating circumstances as well as aggravating circumstances could be presented at the penalty phase.  She then asked:

**MS. BALL:**  . . . The third step is that this case justifies the death penalty beyond a reasonable doubt.  If you – you've brought back a conviction; you, along with the other jurors, for capital murder.  Would you hold me to a higher burden of proof there on sentencing?

**JUROR BARFIELD:**  I don't know.

**MS. BALL:**  Can you imagine a set of circumstances in which the death penalty is appropriate, an appropriate punishment?

**JUROR BARFIELD:**  Yeah, somebody takes a life.

**THE COURT:**  I'm sorry.  I can't hear.  I'm sorry.

**JUROR BARFIELD:**  Oh, I'm sorry.  If somebody takes someone else's life, I do believe that they should die.  But I've never had to be the one to judge that, you know.  So, it's kind of tough here.

*Id*. at 211.  Ball then asked Barfield whether she could put her name on the verdict form to impose

the death penalty, and Barfield said that she could not do that.  *Id*. at 212.

One of the defense lawyers also questioned Barfield.  That exchange was as follows:

**MR. HENDRY:**  . . . Do any of you have an opinion about does [the criminal justice system] work, does it not work?  Ms. Barfield, how do you feel about the criminal justice system?

**JUROR BARFIELD:**  Not very well.  I don't think it works too well.

**MR. HENDRY:**  Okay.  You don't feel very well that it works?  Could you tell me why you feel that?

**JUROR BARFIELD:**  I just don't think it's tough enough, you know, prison systems and time limits.

**MR. HENDRY:**  Okay, the prison system and the time limits or their sentences?

**JUROR BARFIELD:**  That and the way they're treated in prison.

**MR. HENDRY:**  Okay, you think they're treated too softly, I guess?

**JUROR BARFIELD:**  And they get too many benefits that I can't get or my husband who is diabetic, you know.

**MR. HENDRY:**  Okay, you're speaking of medical benefits that they get just because they're incarcerated that –

**JUROR BARFIELD:**  Uh-huh.

**MR. HENDRY:**  Okay.  Is there anything else?  You're speaking, I think, more of the punishment aspect.  What about the law enforcement, police, anything like that.  Do you have any problems with law enforcement?

**JUROR BARFIELD:**  No.

**MR. HENDRY:**  Your main problem is with punishment?

**JUROR BARFIELD:**  Uh-huh.

**MR. HENDRY:**  Okay . . . if Mr. Williams was found guilty of capital murder there's only two punishments; the death penalty or life without parole.  Do you feel that life without possibility of parole is a significant punishment?

**JUROR BARFIELD:**  Yes.

**MR. HENDRY:**  Okay.  No possibility of parole is there.

**JUROR BARFIELD:**  Yeah.

**MR. HENDRY:**  Do you feel like that's punishment?

**JUROR BARFIELD:**  I would have to hear the whole case before I could decide that, you know.

**MR. HENDRY:**  Oh, yeah, I'm not trying to get you to commit.  I just want to know if you feel like –

**JUROR BARFIELD:**  It's a possible punishment.

*Id*. at 224-26.

Later in the interrogation by defense counsel, Juror Barfield answered yes to the question of whether she knew anyone that had been the victim of a crime. She stated that her sister-in-law's sister-in-law "was raped and treated really bad." She thought that the perpetrator was apprehended but didn't serve enough time, only a year or two. *Id*. at 230-31.

On the issue of mitigation, the colloquy was as follows:

> **MR. HENDRY:** . . . [S]ome of the statutory mitigating circumstances that you could consider would be . . . a Defendant who had an emotional or mental problems; someone acting under the power or, I believe, duress or pressures from another person; the youth of a Defendant.
>
> Those are examples of things that our legislature says you can consider as a mitigating circumstance. My question to y'all is not to get you committed to whether you would find that a mitigator, but could you consider those types of things when determining punishment that may be appropriate for capital murder. Ms. Barfield?
>
> **JUROR BARFIELD:** Youth and what else now? Mental?
>
> **MR. HENDRY:** Those are just examples. I'm not saying they will be in this case. But say the youth, a very young person, say fifteen, sixteen years old, I mean, say something like that.
>
> **JUROR BARFIELD:** I don't know. As for me, no, it didn't matter how old I was I knew right from wrong and I was no more going to do something like [that] then than I would now. So, I don't know.
>
> **MR. HENDRY:** Well . . . I'm not trying to get you to commit to a position . . . . But I at least need to know whether you will consider and weigh and determine whether you feel like something is a mitigating circumstance. And let me phrase the question another way; do you feel like there are no mitigating circumstances?
>
> **JUROR BARFIELD:** No, I don't feel that way.

*Id*. at 234-36. With respect to the mental competency, the entire exchange was as follows:

> **MS. BALL:** Ms. Barfield, since we've never met before, it's difficult for me to try to think of questions that will elicit how you really feel about this. Is there a reason that you can tell me that you feel in your heart you should not sit?

**JUROR BARFIELD:**  No, not really; except that I'm a very nervous person and . . . I have real high emotions and I don't know if I can handle it, to tell you the truth, but I'm going to try.  I have pills that I can take.

**MS. BALL:**  And what?

**JUROR BARFIELD:**  I have nerve pills that I can take.

**MR. HENDRY:**  . . . I didn't hear that last statement.  If she could repeat that, please?

**JUROR BARFIELD:**  Repeat the last part?

**MR. HENDRY:**  Yes.

**JUROR BARFIELD:**  I have nerve pills that I take and I just hope that'll, you know, help out.

*Id*. at 215-16.

The examination of Barfield during voir dire has been set out at length so that her answers and the context within which those answers were given can be seen in full.  Her first substantive comment was that she would not want to give the death penalty, not if she wasn't sure.  She answered, "I guess so," when asked if she would hold the State to a higher burden of proof than what the judge would instruct, and that the State would have to prove guilt of the defendant pretty much beyond all doubt.  After the phases of the trial were explained, she stated, "I don't know," when asked if she would hold the State to a higher burden of proof on the sentencing.  When asked whether she could "imagine a set of circumstances in which the death penalty is appropriate," she answered, "Yeah, somebody takes a life."  On the other hand, she then stated that she did not believe that she could put her name on the form imposing the death penalty.  When asked by defense counsel what she thought of the criminal justice system, she said that she did not think that it was tough enough on criminals and that the sentences were not tough enough; but then she stated that she

believed that the possibility of life without parole is a significant punishment. She then stated, "I would have to hear the whole case before I could decide" what punishment to impose but agreed that life without parole was a possible punishment.

When her answers are viewed as a whole, it does not appear that Barfield was committed to imposing the death penalty. She recognized that the death penalty was a grave matter, stated that she would hold the prosecution to a very high burden, and expressed reluctance to put her name on the form imposing the death penalty. In the end, she stated that she would have to hear all of the evidence before she could decide whether the appropriate penalty for capital murder was death or life without parole. When asked about youth as a mitigating circumstance, she twice said, "I don't know." In between those two affirmations that she was not committed, she referred to herself and said that in her youth she knew right from wrong and would not have done something like commit murder, but she did not say, as Williams argues, that she would refuse to consider youth as a mitigating circumstance. In response to the last question posed to her, she stated that she did believe that there are mitigating circumstances that she could consider when deciding whether to vote for life imprisonment without parole or the death penalty.

On the issue of mental competency, the record shows only that Barfield said that she was a very emotional person but that she could take "nerve pills" to help that problem. Williams cites *United States v. Hall*, 989 F.2d 711 (4th Cir. 1993). There, a juror was seated who had been involuntarily committed nine times; had been diagnosed as schizophrenic; and had attempted to kill members of his family. *Id*. at 714. The Fourth Circuit said that the defendant "conclusively proved that Juror X had not been mentally competent at all points in the past." *Id*. Nevertheless, Juror X was found to be competent at trial and the Fourth Circuit affirmed. *Id*.

The Supreme Court of Arkansas held, "Williams did not show he was forced to accept a juror who should have been excused for cause." *Williams I*, 338 Ark. at 112, 991 S.W.2d at 573. That holding is not an unreasonable determination of the facts or an unreasonable application of federal law to the facts. Williams was not forced to accept Benton and Jamison. Williams has not shown that Barfield should have been excluded for cause. Regardless of whether these issues are reviewed de novo or through the deferential standard of AEDPA, the record does not show that Barfield was so biased in favor of the death penalty or against the defendant that she should have been struck from the jury for cause, nor that she was mentally incompetent. Williams's petition on this issue is denied.

IV.     **CLAIM NO. 7. THE ADMISSION INTO EVIDENCE OF THE STATEMENT ILLEGALLY OBTAINED FROM MR. WILLIAMS BY LAW ENFORCEMENT VIOLATED MR. WILLIAMS'S CONSTITUTIONAL RIGHTS.**

At trial, the State introduced a statement made by Williams that Williams contends violated his right to be free from compulsory self-incrimination under the Fifth and Fourteenth Amendments to the Constitution of the United States. He argues that the statement was made involuntarily after thirteen hours of interrogation and was the result of coercion, threats, and false promises of leniency on the part of law enforcement officials.

Williams was arrested on a misdemeanor charge on the afternoon of November 29, 1994. At the time he was arrested, Stacy Errickson was missing but believed to be alive. Williams was a suspect in the case involving Stacy Errickson, and he was also a suspect in the kidnapping and rape of other women. Williams signed a form advising him of his Miranda rights and requesting a waiver of those rights at 4:22 p.m. He was interrogated until 6:00 a.m. the next day. During much of that

time, he insisted that Stacy Errickson was alive when he had last seen her. He offered to show the officers where he had seen her last. The officers transported him from the police department to the location that he identified, and that trip took approximately one hour. He was given breaks to go to the restroom, and he was fed.

Williams argues that the totality of the circumstances, including the length of the interrogation, the fact that he was not informed of all the potential charges that could be lodged against him, the fact that the police officers suggested that they could help him with the prosecutor if he cooperated, Williams's post-traumatic stress disorder, and other circumstances, overcame Williams's free will and rendered his statement involuntary.

Williams presented these arguments on direct appeal from his conviction, and the Supreme Court of Arkansas rejected them. *See Williams I*, 338 Ark. at 112-14, 991 S.W.2d at 573-74. Williams concedes that the Supreme Court of Arkansas articulated the correct legal standard for reviewing the voluntariness of the confession but argues that the court unreasonably applied that legal standard to the facts of this case. This Court has reviewed the transcript of the suppression hearing and does not believe that the Supreme Court of Arkansas unreasonably applied the law on this issue.

As to the waiver of his Fifth Amendment rights, Williams argues that the waiver was invalid because the officers did not inform him that he was a suspect not only in the kidnapping of Stacy Errickson but also in her murder, as well as another kidnapping, robbery, and rape. Williams cites *Colorado v. Spring*, 479 U.S. 564, 107 S. Ct. 851, 93 L. Ed. 2d 954 (1987), for the propositions that the waiver must be the product of a free and deliberate choice rather than intimidation, coercion, or deception, that the waiver was made with full awareness of the nature of the right and the

consequence of abandoning it, and that the totality of circumstances must show that the waiver was uncoerced and made with the proper comprehension. The opinion of the Supreme Court of Arkansas on that point states:

> Williams was arrested and interviewed on November 29, 1994. Police read him the required *Miranda* rights, and Williams gave written consent for interrogation on a police form. The transcript of the interview and police testimony indicated he exhibited knowledge and understanding of the process he was undergoing. Appellant had sufficient education and intelligence to comprehend the explanation of rights having obtained a GED and at least one semester of college. Appellant knew one officer by name. The record reflects the police principally questioned appellant about the abduction hoping that Mrs. Errickson might still be found alive. The victim's body was not found until December 5, 1994. No evidence establishing the commission of a homicide had been found at that time. During the interview, Williams did not confess to murder but instead insisted throughout that she was alive when he last saw her. As of the interview, the police only knew Errickson was missing and that Williams was a suspect. We find Williams understood he was voluntarily giving up substantial rights and that he understood the potential consequences, and accordingly find the trial court was not clearly erroneous.

*Williams I*, 338 Ark. at 113, 991 S.W.2d at 573. This holding is not an unreasonable application of *Colorado v. Spring*. On the issue of the waiver of Fifth Amendment rights, there is no meaningful distinction between *Colorado v. Spring* and this case. There, the Colorado Supreme Court held that the waiver was not knowingly made because Spring was not told that he would be questioned about the homicide for which he was later convicted, which is the argument that Williams makes here. The Supreme Court reversed, saying:

> There also is no doubt that Spring's waiver of his Fifth Amendment privilege was knowingly and intelligently made: that is, that Spring understood that he had the right to remain silent and that anything he said could be used as evidence against him. The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege. *Moran v. Burbine*, [475 U.S. 412,] 422, 106 S. Ct. [1135,] 1141[, 89 L. Ed. 2d 410 (1986)]; *Oregon v. Elstad*, [470 U.S. 298], 316-317, 105 S. Ct. [1285,] 1296-1297[, 84 L. Ed. 2d 222 (1985)]. The Fifth Amendment's guarantee is both simpler and more fundamental: A defendant may not be compelled to be a witness against himself in

any respect. The *Miranda* warnings protect this privilege by ensuring that a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time. The *Miranda* warnings ensure that a waiver of these rights is knowing and intelligent by requiring that the suspect be fully advised of this constitutional privilege, including the critical advice that whatever he chooses to say may be used as evidence against him.

In this case there is no allegation that Spring failed to understand the basic privilege guaranteed by the Fifth Amendment. Nor is there any allegation that he misunderstood the consequences of speaking freely to the law enforcement officials. In sum, we think that the trial court was indisputably correct in finding that Spring's waiver was made knowingly and intelligently within the meaning of *Miranda*.

*Spring*, 479 U.S. at 574-75, 107 S. Ct. at 857-58. The holding of the Supreme Court of Arkansas in *Williams I* seems to follow this holding in *Colorado v. Spring*. The Arkansas court did not unreasonably apply clearly established federal law.

On the issue of whether the confession was coerced, the Supreme Court of Arkansas held:

Mr. Williams also asserts the statement was not voluntary because he was enticed by promises. He alleges the officers promised to go [to] the prosecutor and tell him Mr. Williams had cooperated and knew he'd made a mistake. "A statement induced by a false promise of reward or leniency is not a voluntary statement." *Knight v. State*, 62 Ark. App. 230, 233, 971 S.W.2d 272 (1998), quoting *Clark v. State*, 328 Ark. 501, 944 S.W.2d 533 (1997). As with other aspects of voluntariness, we look at the totality of the circumstances. *Conner v. State*, 334 Ark. 457, 469-70, 982 S.W.2d 655 (1998). During the interview, Williams, not the police, raised the prospect of police discussions with the prosecutors. Although the officer mentioned he would relate Williams's cooperation to the prosecutor, no assurance of any benefit to Williams was conveyed. We find no false promise of leniency.

Conditions of the interview are also alleged to have been coercive. The questioning commenced at 4:22 p.m. and concluded the following morning at 6:00 a.m. At least two officers were present and Mr. Williams alleges he was reduced to tears twice. Length of detention is an issue in an analysis of voluntariness of a confession. *Humphrey v. State*, 327 Ark. 753, 940 S.W.2d 860 (1997). The statement itself is helpful on this issue. Over the thirteen hours, at least two were spent in driving to try and find a house. Length alone, however, is not determinative. We found twelve hours of intermittent questioning to not be coercive in *Vaughn & Wilkins v. State*, 252 Ark. 505, 479 S.W.2d 873 (1972). A critical consideration in this interview was that the focus of the officers was on finding Stacy Errickson, who at the time of the

> interview was still missing and presumed alive. The police remained optimistic that they might find Errickson alive, and over the course of the interview it became increasingly clear Williams had knowledge of her whereabouts but refused to cooperate fully. At one point the police took Williams to a house in Little Rock where he stated he thought Errickson could be found. During the interrogation, Williams was provided food, drink, and cigarettes. He requested that an officer he knew be brought to the interview, and he was obliged. He showed familiarity with the criminal justice system and never once asked that the interview be stopped. While the interview was lengthy and intensive, we hold no impermissible coercion occurred.

*Williams I*, 338 Ark. at 113-14, 941 S.W.2d at 573-74. Williams cites no case other than *Colorado v. Spring* to show that this holding was an unreasonable application of federal law. Nothing in this holding unreasonably applies *Colorado v. Spring*. The Arkansas court recognized that a false promise of leniency could render the statement involuntary but found that no false promise had been made. That finding of fact is not an unreasonable determination of the facts. The same holds true with respect to the finding that the interrogation, though lengthy and intensive, was not coercive. Williams's petition on this point is denied.

## V.  CLAIM NO. 18.  THE SENTENCING PROVISION OF ARKANSAS'S CAPITAL MURDER STATUTES VIOLATES THE CONSTITUTION.

Williams argues that the capital sentencing scheme in Arkansas unconstitutionally constrains the jury's ability to give full effect to mitigating evidence and because the identity between the first degree murder and capital murder instructions unconstitutionally risks an arbitrary sentencing decision. Williams concedes that the statutory scheme in Arkansas has been upheld in the face of these constitutional challenges. *See Singleton v. Lockhart*, 962 F.2d 1315, 1323 (8th Cir. 1992); *Simpson v. Lockhart*, 942 F.2d 493, 496-97 (8th Cir. 1991). Those precedents are binding on this Court. Williams's petition on this point is denied.

## CONCLUSION

Williams's petition for writ of habeas corpus is GRANTED IN PART and DENIED IN PART. Williams's petition is GRANTED as to his claim that errors and omissions of his trial lawyers during the penalty phase of the trial deprived him of his constitutional rights to the effective assistance of counsel and to a fair trial at the penalty phase. The errors and omissions of his lawyers at the penalty phase were prejudicial: it is reasonably probable that but for the errors and omissions of his lawyers the jury would have returned a verdict to impose a sentence of life imprisonment without parole rather than a sentence of death. Williams's petition is DENIED as to all other claims.

Because Williams was given a fair trial at the guilt phase but denied a fair trial at the penalty phase, his convictions of capital murder, kidnapping, rape, and aggravated robbery will not be set aside, but his death sentence will be set aside. The State must afford Williams a new trial at the penalty phase within 120 days of the entry of this Opinion or change his penalty to life imprisonment without parole. A Judgment and Decree so ordering will be entered separately.

IT IS SO ORDERED this 11th day of April, 2007.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE